UNITED STATES DISTRICT COURT               **<u>NOT FOR PUBLICATION</u>**
EASTERN DISTRICT OF NEW YORK
—————————————————

RONALDO RICHARDS,

                    Petitioner,

                                                   **<u>MEMORANDUM & ORDER</u>**

          – against –

GEORGE HARVEY,                                     23-CV-3914 (ERK)

                    Respondent.
—————————————————

KORMAN, *J.*:

       Petitioner Ronaldo Richards, proceeding *pro se*, brings this petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction by a jury

in the Supreme Court of the State of New York, Queens County, on sixteen counts:

first-degree burglary, aggravated criminal contempt, fourth-degree grand larceny,

five counts of first-degree criminal contempt, third-degree assault, second-degree

menacing, fourth-degree criminal mischief, petit larceny, endangering the welfare of

a child, two counts of fourth-degree criminal possession of a weapon, and unlawful

possession of an air pistol.  He was sentenced to an aggregate determinate prison

term of eight years and five years of supervised release.  For the reasons set forth

below, the petition for a writ of habeas corpus is denied.

## I.    Background

### a.  Factual Background[1]

This case arises from a series of incidents involving Petitioner and his estranged wife, Tara Scott, that occurred between March and May 2016.  Petitioner and Scott had previously rented a second-floor bedroom in a house in Cambria Heights, Queens, where they lived with several housemates.  ECF No. 10-4 at 417–18.[2]  After an incident between Petitioner and Scott in February 2015, Petitioner moved out of the Cambria Heights house, and Scott took away his key.  *Id.* at 418–19.  Scott also moved out following the incident to live temporarily in a shelter for "safety reasons," before returning to the Cambria Heights house around April 2015.  *Id.* at 419–20.  In January 2016, Scott obtained a "full stay away" order of protection against Petitioner, which was in effect until October 2016.  *Id.* at 420.

### i.  March 5, 2016 Incidents

On March 5, 2016, in violation of the order of protection, Petitioner went twice to Scott's house in Cambria Heights.  At around 11:00 a.m. that day, Petitioner showed up at Scott's front door and initially spoke with one of Scott's housemates.  *Id.* at 423–24.  Scott then spoke with Petitioner through the screen attached to her

---

[1] The following facts are taken from the state court record and are viewed in the light most favorable to the prosecution.  *See Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

[2] Citations to the record are to the page number in the ECF header.

front door and reminded him of the order of protection. *Id.* at 424. Petitioner asked where their 15-month-old daughter was, and Scott falsely said that she was in Jamaica. *Id.* Scott then took a photograph of Petitioner through the screen door. *Id.* Petitioner grabbed the door handle, and Scott closed the front door on him. *Id.*

Scott then called 911 and reported Petitioner's violation of the order of protection. *Id.* at 425. Police Officer Robert Hassett and his partner, Officer Smith, reported to Scott's house, and she told them about her encounter with Petitioner. *Id.* at 425, 531–34. Scott was upset but she had no visible injuries. *Id.* at 534. The officers canvassed the area surrounding Scott's house for Petitioner but did not find him. *Id.* The officers then returned to the house, took a police report, and went back out on patrol. *Id.* at 534–35.

At around 1:30 p.m. that day, Petitioner returned to Scott's house. *Id.* at 426. Scott was in her bedroom with her daughter when she noticed Petitioner standing in her doorway. *Id.* at 425–27. Scott asked Petitioner what he was doing, and Petitioner began to push open other doors on the floor, asking if anyone else was home. *Id.* at 427. Scott closed and bolted her bedroom door and ran towards her window to scream for help. *Id.* Petitioner kicked open the bedroom door and then kicked and punched Scott in her head and stomach. *Id.* at 427–29. Petitioner also threatened her with a knife. *Id.* at 428. He told her that if she called the police, he would kill her and her mother. *Id.* Scott's cell phone rang, and Petitioner took the phone from her and demanded that she remove the phone's password. *Id.* at 430. He also

3

insisted that she give him her debit card and the card's PIN. *Id.* Scott did as Petitioner demanded (although she provided a fabricated debit card PIN), and Petitioner took her phone, debit card, and purse (which held $200 in cash, a credit card, and Scott's insurance cards, among other items). *Id.* at 430–31. Petitioner then ran out of the house through the front door. *Id.* at 431.

Scott went downstairs and noticed that the basement door was unlocked. *Id.* at 432. She then called 911 for a second time that day on her landline. *Id.* Officer Hassett again reported to Scott's house in response to her call. *Id.* at 536. When he arrived, he observed that Scott was crying and that she had a cut over her left eye. *Id.* at 537. After speaking with Scott, Officer Hassett canvassed the neighborhood again but did not locate Petitioner. *Id.*

Scott called Etta Badoe, one of her housemates, who had been visiting a family member in the hospital that afternoon. *Id.* at 555. Badoe observed that Scott was upset during the call. *Id.* Badoe returned to the Cambria Heights house after their call and found Scott packing her belongings to leave the house. *Id.* at 556. Badoe saw that the door to Scott's bedroom had been damaged and the lock looked like it had been broken. *Id.* Badoe later went down to the basement of the house and noted that the basement window was broken. *Id.* at 557.

Later that day, Scott dropped off her daughter at a friend's house and went to a T-Mobile store to get a replacement cell phone chip. *Id.* at 445. She then went to Queens Hospital Center, where she received an MRI, a tetanus shot, and an eye

exam.  *Id.* at 445–46.  Scott reported that her level of pain when she arrived at the hospital was a "ten" on a scale of one to ten.  *Id.* at 446.  The cut over her left eye took about two weeks to heal, and she experienced pain in that eye until November of that year.  *Id.* at 446–47.  Scott reported seeing flashers and floaters in her left eye, *id.*, and her medical records from March 5, 2016 also indicate that she had a "blood spot" in that eye, *see* ECF No. 10-3 at 119.  Scott testified that she saw an eye specialist in November 2016, who diagnosed her with a torn retina and performed minor surgery to repair the tear.  ECF No. 10-4 at 503.

While Scott was at the hospital, one of her housemates sent her a photograph showing that the window in their basement was broken.  *Id.* at 448.  After leaving the hospital, Scott stayed with a friend for several days because she felt unsafe in the Cambria Heights house.  *Id.* at 450.  Scott then went to a women's domestic violence shelter, where she stayed for nine months.  *Id.*

### ii.  May 18, 2016 Arrest of Petitioner

In May 2016, Scott began receiving phone calls and text messages from unknown and private numbers.  *Id.* at 451.  Sometimes, it was Petitioner calling; other times, the caller did not speak.  *Id.* at 451–52.  Petitioner asked for Scott to allow him to see their daughter, among other things.  *Id.*

On May 18, 2016, Petitioner called Scott and asked to meet.  *Id.* at 462.  Scott agreed and told him to meet her on Jamaica Avenue in Queens.  *Id.*  After the call with Petitioner, Scott went to the police station, where she spoke with Detective Paul

Piccininni about her history with Petitioner. *Id.* at 463, 563–64. Detective Piccininni confirmed that Scott had previously filed a complaint alleging that Petitioner had violated an order of protection and had entered her home, physically assaulted her, and taken her property. *Id.* at 564. Detective Piccininni also verified that an investigation I-card was issued for probable cause to arrest Petitioner. *Id.* at 565. Detective Piccininni told Scott that the police officers would accompany her to the meeting with Petitioner and apprehend him. *Id.* at 567. Detective Piccininni also asked Scott for a physical description of Petitioner. *Id.* They arranged for four officers to go with Scott to the meeting, and the officers split into two cars—two in a car with Scott and two in another car. *Id.* at 463, 512, 567–68.

Once at the meeting spot on Jamaica Avenue, Detective Piccininni, who was not in the car with Scott, recognized Petitioner based on his body language, the location, and Scott's description. *See id.* at 568–69. Detective Piccininni approached Petitioner and asked for his name, and Petitioner replied that his name was Ronaldo Richards. *Id.* at 569–70. Detective Piccininni told Petitioner that he was under arrest for domestic violence and asked him to put his hands behind his back. *Id.* at 570. Detective Piccininni asked Petitioner if he had any weapons on him, and Petitioner told him that he had a gun but that it was fake. *Id.* Detective Piccininni handcuffed Petitioner and retrieved the gun, which was later confirmed to be an air pistol. *Id.* at 570–72. Detective Piccininni asked Petitioner why he had

6

the gun, and he said it was for protection because he sometimes slept on subway trains. *Id.* at 580.

After Petitioner was arrested, Scott did not receive any further phone calls or text messages from unknown numbers. *Id.* at 464.

### b. Procedural History

On December 15, 2016, Petitioner was indicted by a Queens County grand jury on eighteen counts for crimes pertaining to the March 5, 2016 incidents, his May 2016 communications to Scott in violation of the order of protection, and his possession of the air pistol at the time of his arrest. *See* ECF No. 10-3 at 26–27, 144.

### i. Suppression Hearing

At a pre-trial suppression hearing, Petitioner, who was represented by counsel, moved to suppress his statements to Detective Piccininni about having a fake gun, contending that the statements were obtained in violation of his *Miranda* rights. *See* ECF No. 10-4 at 5–40. The prosecutor conceded at the hearing that Petitioner was in custody at the time Detective Piccininni questioned him and that Petitioner had not been read his *Miranda* warnings prior to the questioning; she argued, however, that Detective Piccininni had the right to ask Petitioner whether he had any weapons out of concern for the safety of the public and the officers, particularly because Petitioner was wanted for a violent crime. *Id.* at 27–29, 36–39. Petitioner's motion to suppress his statement that he possessed a fake gun was denied because this statement was "part of the investigation," but his motion to suppress his statement

7

that he had the gun for protection because he sometimes slept on subway trains was granted. *Id.* at 39–40.

### ii. Request to Cross-Examine Scott About Immigration Status

Prior to trial, Petitioner's counsel asked for information about Scott's immigration status, particularly whether Scott had obtained a visa through the Violence Against Women Act ("VAWA") based on the incidents at issue in the instant prosecution.[3]  *Id.* at 44–46.  The prosecutor responded that the district attorney's office had not assisted Scott with obtaining a visa but that Scott had worked with a private attorney to file an application for permanent residency under VAWA in August 2015, prior to the incidents underlying the instant case. *Id.* at 46.

Subsequently, when the parties appeared for jury selection, Petitioner's counsel informed the trial judge that she planned to cross-examine Scott about her immigration status and her VAWA application. *Id.* at 72–73.  Defense counsel indicated that she believed she could establish that Scott had a motive to lie about the present charges to receive immigration benefits under VAWA. *Id.* at 72.  In response, the prosecutor argued that Scott had filed for VAWA protection in August

---

[3] VAWA allows "victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity" to obtain a "U Visa."  USCIS, Victims of Criminal Activity: U Nonimmigrant Status, https://www.uscis.gov/humanitarian/victims-of-criminal-activity-u-nonimmigrant-status (last visited Mar. 18, 2025); *see also* 8 U.S.C. §§ 1101(a)(15)(U), 1184(p).

2015, months before the events underlying the instant case, and that the visa application was not based on the incidents at issue in this case. *Id.* at 73.  Defense counsel contended that Scott had reason to fabricate an "ongoing pattern of abuses or alleged abuses" because her VAWA application was an "ongoing process" that would be "thoroughly explore[d]" before being granted or denied. *Id.* at 76–77.  The trial judge granted defense counsel's request to cross-examine Scott about her VAWA application and immigration status but noted that this would "expos[e] [Petitioner's] violent history with [Scott]."  *Id.* at 77.  Defense counsel acknowledged that cross-examination on these issues would bring to light prior uncharged incidents between Petitioner and Scott. *Id.* at 77–78.  The judge reserved decision on whether the prosecutor could elicit the underlying facts of the prior incidents on redirect examination. *Id.* at 78.

After speaking with Scott, the prosecutor informed the trial judge that Scott did not yet have legal permanent resident status but did have a work permit as a result of her VAWA application. *Id.* at 210.  The prosecutor also reported that Scott had denied supplementing her VAWA application with information about the March or May 2016 incidents. *Id.* at 210–11.  The judge maintained his prior decision to allow defense counsel to cross-examine Scott regarding her VAWA application and ruled that the prosecutor could question her on redirect examination about the incidents underlying her application. *Id.* at 214.

9

### iii.  Trial & Sentencing

At trial, the prosecution's evidence—which included testimony from Scott, Officer Hassett, Detective Piccininni, and Badoe; the order of protection against Petitioner; a recording of Scott's second 911 call on March 5, 2016; Scott's medical records from March 5, 2016; photographs of the cut above Scott's left eye, the damaged door to Scott's bedroom, and the broken window in the basement of the Cambria Heights house; and the air pistol that Petitioner was carrying when he was arrested—established the events as described above.

On cross-examination, defense counsel questioned Scott about her immigration status and VAWA application.  Scott testified that she entered the United States from Jamaica on a J-1 visa in May 2011 and remained in the United States when her visa expired the following year.  *Id.* at 489–90.  She spoke to an immigration lawyer in August 2015 about obtaining legal immigration status under VAWA based on an incident with Petitioner that occurred in February 2015.  *Id.* at 494.  She was aware that immigration status under VAWA is only available to an abused spouse of a lawful permanent resident or United States citizen.  *Id.* at 495. She also confirmed that, as part of the VAWA application process, she needed to supply documentation to substantiate her allegations.  *Id.*

On redirect, the prosecutor asked Scott about the incidents underlying her VAWA application.  Scott testified that two incidents had served as the basis of her application and that the events at issue in the instant prosecution were not included

in or used to supplement her application. *Id.* at 519, 522. In the first incident, which occurred when Scott was about four months pregnant, Petitioner entered their bedroom after smoking marijuana and turned on the television, waking up Scott. *Id.* at 519–20. Scott tried to move to the living room, but Petitioner hit her phone out of her hands, dragged her by her hair, slapped her in the face, and hit her head against the headboard. *Id.* He also took her cell phone and refused to return it until the following day. *Id.* During the second incident, which occurred in February 2015, Petitioner choked and slapped Scott in the face numerous times after she declined his request to engage in sexual activity. *Id.* at 521. After this incident, he again took her cell phone. *Id.* The trial judge instructed the jury that this testimony was "not . . . being offered for the truth of what happened" but for the "limited purpose" of explaining Scott's motive in applying for the visa that "was mentioned on cross-examination." *Id.* at 520.

During summation, defense counsel continued to focus on Scott's immigration status, arguing that Scott was lying about the incidents at issue to gain custody of her child with Petitioner and to support her application for a visa under VAWA, which defense counsel emphasized was "a long term process." *See id.* at 615–28. Counsel also encouraged the jury to consider aspects of Scott's testimony that undermined her credibility, such as the fact that Scott testified that her pain after the incident with Petitioner on March 5, 2016 was a "ten out of ten" but that she still was able to stop at a T-Mobile store before going to the hospital. *Id.* at 617–18.

11

Eighteen counts were submitted to the jury: first-degree burglary and second-degree burglary as a lesser included offense, aggravated criminal contempt, fourth-degree grand larceny, five counts of first-degree criminal contempt, third-degree assault, second-degree menacing, fourth-degree criminal mischief, petit larceny, endangering the welfare of a child, criminal obstruction of breathing or blood circulation, two counts of fourth-degree criminal possession of a weapon, and unlawful possession of an air pistol. *See* ECF No. 10-5 at 22–54. The charges for first-degree burglary, aggravated criminal contempt, and third-degree assault included a "physical injury" element. The trial judge defined "physical injury" as "impairment of physical condition or substantial pain" and precluded the jury from considering Scott's testimony about her torn retina in determining whether she sustained a physical injury during the March 5, 2016 incident because the prosecution did not enter into evidence the relevant medical records or have a medical witness testify about the cause of the torn retina. *Id.* at 21, 24. The trial judge also provided a limiting instruction regarding Scott's testimony about the incidents underlying her VAWA application, reiterating that the testimony "is not to be considered for the truth of what happened" and "is only permitted . . . to explain her motive or desire to apply for a [VAWA] visa." *Id.* at 21.

The jury convicted Petitioner on all counts except for criminal obstruction of breathing or blood circulation and second-degree burglary (a lesser included offense of first-degree burglary, of which Petitioner was convicted). *Id.* at 82–88. On

April 10, 2018, Petitioner was principally sentenced to eight years of imprisonment. *Id.* at 101–03.

### iv. Direct Appeal

On appeal, Petitioner argued, as relevant to this petition, that his conviction should be reversed because his trial counsel was ineffective for "embark[ing] on an inexplicably prejudicial course and argu[ing] that [Scott] lied about [Petitioner's] alleged domestic abuse to apply for a visa through [VAWA] when (1) counsel knew months before trial that the underlying crimes were not the basis of that application; (2) counsel was repeatedly warned by the trial judge that such an argument would result in the admission of uncharged conduct; (3) counsel's arguments resulted in the admission into evidence of two horrific uncharged domestic violent incidents that would have otherwise been inadmissible; and (4) counsel continued advancing this fruitless argument in summation." ECF No. 10-3 at 28. Petitioner also argued that his counsel was ineffective for failing to move at the end of the prosecution's case to dismiss the charges that included a "physical injury" element on the ground that the prosecution had failed to prove that Scott had suffered a "substantial pain" or that her physical condition was impaired. *See id.* at 38–42.

The district attorney's office opposed the appeal. With respect to Petitioner's argument that his counsel embarked on a prejudicial course by cross-examining Scott about her VAWA application, the district attorney argued that defense counsel had "presented a strong defense theory designed to show that the victim, who was

13

unlawfully in the US, lied about the abuse because she wanted to gain full custody of her and [Petitioner's] daughter and obtain her green card by using [Petitioner's] lawful permanent residency status." *Id.* at 70. The district attorney also argued that, to the extent that defense counsel's cross-examination opened the door to Scott's testimony about prior abuse by Petitioner, this testimony did not prejudice Petitioner because the jury was already aware that there had been prior incidents between Petitioner and Scott and because the trial judge directed the jury that it could not consider this testimony as evidence of the charged crimes. *Id.* at 75–76. Regarding Petitioner's argument that counsel was ineffective for failing to move to dismiss the charges that required proof of physical injury, the district attorney argued that there was ample proof that Scott had suffered physical injury, including her testimony about the severity and duration of the pain she experienced and the medical treatment she received, the recording of her 911 call, the photograph of the cut above her left eye, her medical records, and the testimony of Officer Hassett. *Id.* at 82–85.

The Appellate Division unanimously affirmed Petitioner's conviction. *People v. Richards*, 171 N.Y.S.3d 834 (App. Div. 2022). It found that "defense counsel provided meaningful representation" and that "[d]efense counsel's decision to cross-examine [Scott] about her application to obtain a visa under [VAWA], despite the fact that it opened the door to testimony about [Petitioner's] prior bad acts, was a matter of trial strategy." *Id.* at 834. The Appellate Division noted that trial counsel was "attempting to undermine [Scott's] credibility by showing that she had motive

to lie" and concluded that "[i]t is well settled that unsuccessful trial strategies and tactics do not constitute ineffective assistance of counsel." *Id.* (internal quotation marks and citation omitted). It also determined that defense counsel was not ineffective for failing to move to dismiss the counts that included a "physical injury" element because "that motion had little or no chance of success." *Id.*

Petitioner unsuccessfully sought leave to appeal to the Court of Appeals. *See People v. Richards*, 39 N.Y.3d 1074 (2023). In his leave application, Petitioner argued only that trial counsel was ineffective for cross-examining Scott about her VAWA application. *See* ECF No. 10-3 at 109–11.

### v. Petition for Writ of Habeas Corpus

On May 10, 2023,[4] Petitioner filed the instant *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254. *See* ECF No. 1 at 1, 14. Construed liberally, his petition raises four primary grounds for relief: (1) his Fifth Amendment right against self-incrimination was violated because he was not provided *Miranda* warnings prior to his statement to Detective Piccininni that he possessed a fake gun; (2) he was denied a speedy indictment in violation of the Fifth Amendment because he was arrested ten to eleven months before he was indicted; (3) the evidence was legally insufficient to support his conviction because (a) Scott provided fabricated

---

[4] Under the "prison mailbox rule," the operative filing date for a *pro se* prisoner's writ of habeas corpus is the date the petition was delivered to prison officials for forwarding to the court. *See Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001).

testimony and (b) the prosecution failed to present medical records of Scott's retinal surgery; and (4) trial counsel provided ineffective assistance by (a) presenting a defense that allowed in prejudicial testimony about additional uncharged incidents between Petitioner and Scott, (b) prohibiting Petitioner from testifying, and (c) failing to call a witness at trial who would have presented an alibi defense for Petitioner. *Id.* at 5–8.

In opposition, Respondent argues that Petitioner's claims regarding the violation of his right against self-incrimination, denial of a speedy indictment, and insufficient evidence are procedurally defaulted and meritless. *See* ECF No. 10-1 at 18–30. With respect to Petitioner's ineffective assistance of counsel claim, Respondent contends that Petitioner's argument about counsel's decision to cross-examine Scott on her immigration status was rejected on the merits by the Appellate Division and that Petitioner cannot carry his burden of demonstrating that the Appellate Division's determination was objectively unreasonable. *Id.* at 30–31, 42–47. Respondent asserts that Petitioner's other two ineffective assistance of counsel arguments are unexhausted and that, although they could be raised in a motion to vacate judgment under state law, they are meritless and thus should be denied. *Id.* at 31–33, 48–53; *see also* N.Y. Crim. Proc. Law ("C.P.L.") § 440.10 (provision governing motion to vacate judgment).

Petitioner filed a reply, conceding that some of his claims have not been exhausted in state court. ECF No. 12 at 1. He states that he "wasn't aware on how

to proceed to exhaust my claims in the State Court" and that he was told by his appellate lawyer that "the only issues that can be raise[d] on . . . direct appeal was what's mentioned at trial and what was on the record." *Id*. Petitioner requests that the petition be dismissed without prejudice so that he can exhaust his unexhausted claims in state court. *Id.* On the day he submitted his reply, Petitioner also filed a letter requesting that the petition be dismissed without prejudice.[5] *See* ECF No. 13.

## II. Discussion

### a. Standard of Review

A person in state custody pursuant to a state-court judgment may seek a writ of habeas corpus on the ground that he is being held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C § 2254(a). In order to obtain relief, the petitioner must demonstrate, *inter alia*, that he has: "(1) exhausted his

---

[5] In his reply, Petitioner states: "I explain all these facts to my appealate [*sic*] lawyer about the misrepresentation of my trial lawyer. The fact that my trial lawyer didn't present or mention my witnesses/alibi at trial, my trial lawyer didn't properly investigate my case in order to have a solid strategy to defend my innocences [*sic*] and the trial lawyer also failed to surpess [*sic*] evidence at trail [*sic*] proceedings." ECF No. 12 at 1. In addition, in his letter filed the same day as his reply, Petitioner states: "The defense counsel [*sic*] also fail to object to the complainant hearsey [*sic*] witnesses, the lawyer also fail to challenge the missing witness charges and also to surpess [*sic*] incredible evidence at trial proceeding." ECF No. 13. To the extent that Petitioner asserts additional grounds for habeas relief in these filings, these undeveloped claims will not be considered because "to allow petitioner to raise . . . claims on reply would undermine AEDPA's purpose of preventing abuse of the writ by piecemeal litigation of claims." *See Rosario v. Laclair*, No. 20-CV-5475, 2024 WL 4476165, at *16 n.13 (S.D.N.Y. Oct. 11, 2024).

potential state remedies; (2) asserted his claims in his state appeals such that they are not procedurally barred from federal habeas review; and (3) satisfied the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), if his appeals were decided on the merits." *Edwards v. Superintendent, Southport C.F.*, 991 F. Supp. 2d 348, 365–66 (E.D.N.Y. 2013).

AEDPA provides that an "application for a writ of habeas corpus . . . pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings," unless adjudication of that claim resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision on the merits is "contrary to . . . clearly established" federal law if the state court "(1) arrives at a conclusion opposite to one reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Dale v. Russell*, No. 24-CV-00143, 2025 WL 486686, at *4 (E.D.N.Y. Feb. 13, 2025). "A state court decision is an 'unreasonable application' of clearly established federal law if the state court identifies the correct controlling legal principle announced by the Supreme Court but unreasonably applies that principle to the facts of the petitioner's case." *Id.*

### b.  Exhaustion and Procedural Default

A petitioner seeking habeas relief must demonstrate that he has exhausted his remedies available in state court.  *See* 28 U.S.C. § 2254(b)(1).  To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, affording the courts the "opportunity to pass upon and correct alleged violations" of the petitioner's federal rights.  *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citation omitted).  In doing so, the petitioner must inform the state courts "about both the factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001) (citing *Picard*, 404 U.S. at 276–77).  The exhaustion requirement is fulfilled only when the petitioner's claims have been presented to the highest court of the pertinent state.  *Id.*

When a habeas petition presents unexhausted claims, the federal court must determine whether the petitioner would be able to return to state court to exhaust the claims.  If a claim is unexhausted and the petitioner cannot obtain further review of the claim in state court for procedural reasons, then the federal court may deem the claim exhausted and procedurally defaulted.  *See Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001); *see also Zimmerman v. Burge*, 492 F. Supp. 2d 170, 189 (E.D.N.Y. 2007) ("Claims that are unexhausted in the state court may be deemed to be exhausted and procedurally barred if the state court to which he would be required to present his claim would find the claim procedurally barred.").  A claim that is procedurally defaulted is unreviewable by a federal court absent a showing of either

19

"cause for the default plus prejudice, or a showing of actual innocence." *Aparicio*, 269 F.3d at 91; *see also Gray v. Netherland*, 518 U.S. 152, 162 (1996).  The court may find cause where "some objective factor external to the defense" prevented the petitioner from presenting the claim. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  A petitioner can demonstrate "prejudice" by showing that "'there is a reasonable probability that the result of the trial would have been different' had the alleged constitutional violation not occurred." *Edwards*, 991 F. Supp. 2d at 367 (quoting *Strickler v. Greene*, 527 U.S. 263, 289 (1999)).

In the instant case, Petitioner asserts several grounds for habeas relief that were not exhausted in state court.  First, Petitioner's allegation that his right against self-incrimination was violated was not presented to the state court.  Indeed, although this argument was presented during a pre-trial suppression hearing and thus could have been raised by Petitioner on appeal, Petitioner did not do so.  Second, Petitioner's allegation that the delay between his arrest and indictment was unconstitutional was not raised to the trial court and was not addressed on his direct appeal.  Finally, Petitioner's argument that there was insufficient evidence to support his conviction was also not raised on his direct appeal.  Although Petitioner did argue on appeal that his trial counsel was ineffective for failing to move to dismiss the charges that included a "physical injury" element on the grounds that the prosecutor had not proved that Scott had suffered "substantial pain" or a physical impairment, the current allegation rests on distinct legal and factual grounds and therefore was

not fairly presented to the state court.  *See Daye v. Att'y Gen. of N.Y.*, 696 F.2d 186, 191–92 (2d Cir. 1982) ("In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court.").

Petitioner no longer has avenues available in state court to raise these claims and thus the claims are procedurally defaulted.  Petitioner has already used the one direct appeal to which he was entitled in the state court and failed to raise these issues.  *See Banks v. Macintosh*, No. 21-CV-06586, 2024 WL 3493311, at *5 (W.D.N.Y. July 22, 2024); N.Y. Rules of Court § 500.20(a)(2) (an application seeking leave to appeal "shall indicate . . . that no application for the same relief has been addressed to a justice of the Appellate Division, as only one application is available").  Because these claims are record-based, Petitioner was required to raise them on direct appeal and cannot now assert them in a motion to vacate the judgment under state law.  *See* C.P.L. § 440.10(2)(c) (a motion to vacate judgment must be denied where, "[a]lthough sufficient facts appear on the record . . . to have permitted . . . adequate review [on appeal] of the ground or issue . . . no such appellate review or determination occurred owing to the defendant's . . . unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him").[6]  Accordingly, these claims are deemed exhausted and procedurally defaulted.

---

[6] It is possible that Petitioner could file a motion under C.P.L. § 440.10 asserting his pre-indictment delay claim on the grounds that the judgment against him was

Petitioner has not set forth any cause for the default or actual prejudice resulting therefrom or shown that he is actually innocent.  Petitioner alleges that his appellate counsel told him that he could not bring these claims on appeal because his trial counsel had not raised the issues in the trial court.  *See* ECF No. 12. However, an attorney's failure to raise a claim "does not constitute cause for a procedural default" so long as the petitioner was "represented by counsel whose performance [was] not constitutionally ineffective."  *Murray*, 477 U.S. at 486–88. To the extent that Petitioner attempts to establish cause for the default based on the ineffective assistance of counsel, the exhaustion doctrine "requires that a claim of ineffective assistance be presented to state courts as an independent claim before it may be used to establish cause for a procedural default."  *Id.* at 489.  Petitioner has not brought in state court a claim of ineffective assistance of counsel on the grounds

---

obtained in violation of his constitutional right to due process. *See People v. Young*, 139 N.Y.S.3d 718, 725–26 (App. Div. 2021) (upholding denial on the merits of § 440.10 motion raising pre-indictment delay claim); C.P.L. § 440.10(1)(h) ("At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that . . . [t]he judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States.").  As Respondent suggests, *see* ECF No. 10-1 at 19, however, because the pre-indictment delay was apparent from the trial record, the state court may deny such a motion on the grounds that the claim should have been raised on appeal, even though it was not raised at trial, *see* C.P.L. § 440.10(2)(c); *cf. id.* § 470.15(3)(c) (providing that the appellate court can reach issues unpreserved for review "[a]s a matter of discretion in the interest of justice"). Regardless, even if this claim is not procedurally barred because Petitioner could bring it in a § 440.10 motion, the claim is meritless, as discussed below.

that trial counsel failed to raise his unexhausted self-incrimination or pre-indictment delay claims.[7]  Although Petitioner did argue on direct appeal that trial counsel was ineffective for failing to move to dismiss the charges that included a "physical injury" element on the ground that the prosecutor had failed to prove that Scott suffered "substantial pain" or that her physical condition was impaired in any way, Petitioner's current argument—that the "physical injury" element was not proved because the prosecution did not enter into evidence medical records from Scott's retinal surgery—is distinct.  In addition, in his leave application, Petitioner did not raise any argument that trial counsel was ineffective for failing to move to dismiss those charges on insufficient evidence grounds.  Consequently, because Petitioner did not exhaust this claim to the highest state court, it cannot provide cause to excuse his default.  Moreover, Petitioner has not attempted to demonstrate that he would suffer prejudice from barring review of these claims or that he is actually innocent. In any event, even if Petitioner were able to show that he could overcome procedural default, these claims would be denied on the merits for the reasons set forth below.

Petitioner's ineffective assistance of counsel claim, on the other hand, is unexhausted and not procedurally barred.  Respondent argues that Petitioner's ineffective assistance claim based on counsel's decision to cross-examine Scott

---

[7] Indeed, trial counsel did move to suppress Petitioner's post-arrest statements based on a *Miranda* violation, and thus any argument that counsel was ineffective for failing to raise this issue at trial would almost certainly fail.

about her VAWA application is exhausted because Petitioner raised this allegation on direct appeal. The Second Circuit has held, however, that an ineffective assistance of counsel claim "turn[s] on the cumulative effect of all of counsel's actions" and as such, "all of [a petitioner's] allegations of ineffective assistance should be reviewed together." *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991). Thus, where a petitioner, as here, asserts multiple allegations of ineffective assistance of counsel, some of which were presented in state court and others that were not, the "entire ineffective assistance of . . . counsel claim . . . has not been fairly presented to the state courts . . . ." *Bethany v. Noeth*, No. 20-CV-6761, 2022 WL 17812574, at *3 (W.D.N.Y. Dec. 19, 2022); *see also Persaud v. Connelly*, No. 14-CV-7087, 2020 WL 3470250, at *2 (E.D.N.Y. June 25, 2020) ("[A] claim raising ineffective assistance of counsel is deemed exhausted only when each of the grounds in support of the claim have been presented to the state courts."). Because Petitioner could still raise these arguments in a C.P.L. § 440.10 motion, the ineffective assistance of counsel claim is not procedurally defaulted. *See* C.P.L. § 440.10(2)(c) (permitting ineffective assistance of counsel claim to be raised in motion to vacate judgment even if issue could have been raised on direct appeal).

Accordingly, the instant petition is a "mixed" petition, consisting of both unexhausted and exhausted (albeit procedurally defaulted) claims. A district court may adjudicate a mixed petition in one of four ways: "(1) dismiss the petition without prejudice so that the petitioner may exhaust his unexhausted claims; (2) stay

24

the petition to allow the petitioner to return to state court and exhaust his claims; (3) allow the petitioner to delete the unexhausted claims and proceed with only his exhausted claims; or (4) deny the petition on the merits." *Guerriero v. Montagari*, No. 23-CV-01285, 2025 WL 218787, at *3 (E.D.N.Y. Jan. 16, 2015).

The fourth option is most appropriate in the instant case because the claims raised by Petitioner are plainly meritless, for the reasons discussed below. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Rhines v. Weber,* 544 U.S. 269, 277 (2005) ("[T]he district court would abuse its discretion if it were to grant [petitioner] a stay when his unexhausted claims are plainly meritless."). Although Petitioner requests that the petition be dismissed without prejudice, this option is inappropriate both because the claims are meritless and because dismissal of the petition would jeopardize Petitioner's ability to obtain habeas review given that the statute of limitations has expired.[8]  *See Brewer v. Eckert*, No. 19-CV-6486, 2020 WL 10061923, at *5 (W.D.N.Y. Sept. 10, 2020) ("[D]ismissal of the habeas application

---

[8] AEDPA provides a one-year period of limitations for the filing of a petition for a writ of habeas corpus by a person in custody pursuant to a state court judgment. *See* 28 U.S.C. § 2244(d)(1). In Petitioner's case, the statute of limitations period expired on April 30, 2024, a year after Petitioner's time for filing a petition for a writ of certiorari in the United States Supreme Court expired. *See Pratt v. Greiner*, 306 F.3d 1190, 1195 (2d Cir. 2002).

in its entirety without prejudice[] is only appropriate when doing so would not jeopardize the timeliness of a subsequent collateral attack."); *see also Clarke v. Griffin*, No. 13-CV-4812, 2016 WL 206476, at *2, *5–6 (S.D.N.Y. Jan. 14, 2016). Moreover, it is not appropriate to stay the petition in this case because Petitioner has not shown good cause for his failure to exhaust his claims in state court and because his claims are plainly meritless. *See Rhines*, 544 U.S. at 277–78 (holding that courts should not grant a stay of a § 2254 petition unless the petitioner has demonstrated that he had "good cause" for failing to exhaust his claims in state court and that his unexhausted claims are "potentially meritorious"). Finally, Petitioner's unexhausted claims may not be "deleted" because he has not "expressly and unequivocally acknowledged to the . . . court that he was abandoning [those] claims." *Alke v. Artus*, No. 12-CV-5977, 2013 WL 4700828, at *2 (E.D.N.Y. Sept. 1, 2013) (quoting *Grady v. LeFevre*, 846 F.2d 862, 865 (2d Cir. 1988)).  Thus, in the light of AEDPA's "goals of encouraging finality and reducing delays," and given that the claims raised by Petitioner are meritless, the petition will be denied in its entirety on the merits for the reasons stated below. *Dorcinvil v. Kopp*, 710 F. Supp. 3d 128, 148 (E.D.N.Y. 2024) (quoting *Johnston v. Senkowski*, No. 01-CV-1770, 2005 WL 1388880, at *3 (N.D.N.Y. June 9, 2005)); *see also Padilla v. Keane,* 331 F. Supp. 2d 209, 216 (S.D.N.Y. 2004) (exercising discretion under § 2254(b)(2) to dismiss meritless, unexhausted claims "[i]n the interest of judicial economy"); *cf.* Fed. R. Civ. P. 41(a)(2) (providing that, once an opposing party has served an answer in an action,

the "action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper").

### c. Merits

#### i. *Miranda* Violation Claim

Petitioner argues that he should be granted habeas relief because his "MIRANDA warning was not read [*sic*] to the defendant upon arrest." ECF No. 1 at 5. Construed liberally, Petitioner appears to assert that the trial court violated his right against self-incrimination guaranteed by the Fifth Amendment when it did not suppress Petitioner's statement that he was carrying a fake gun in response to Detective Piccininni's questioning during his arrest on May 18, 2016.

In *Miranda v. Arizona*, the Supreme Court ruled that law enforcement may not interrogate a suspect who has been taken into custody without first warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. 436, 479 (1966). If a suspect is not so warned, the Fifth Amendment prohibits the prosecution from using statements obtained during the interrogation to establish its case in chief. *See Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

In *New York v. Quarles*, the Supreme Court established a "narrow exception to the *Miranda* rule" when arresting officers ask a suspect "questions necessary to

secure their own safety or the safety of the public."  467 U.S. 649, 656–59 (1984).

Under this "public safety exception," "*Miranda* warnings need not precede

'questions reasonably prompted by a concern for the public safety' or for the safety

of the arresting officers" for a suspect's answers to be admitted as evidence of his

guilt.  *United States v. Reyes*, 353 F.3d 148, 152 (2d Cir. 2003) (quoting *Quarles*,

467 U.S. at 656, 658–59).  The exception permits law enforcement to question

suspects prior to providing *Miranda* warnings in situations where there is an

objectively reasonable need to protect against danger given the "totality of the

circumstances."  *See United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005)

(quoting *Reyes*, 353 F.3d at 152).

Although the prosecution conceded during the suppression hearing that

Petitioner was in custody during the relevant exchange with Detective Piccininni,

the detective's question was justified because it was objectively reasonable for him

to be concerned about the safety of the surrounding public and the officers.

Petitioner was arrested on a public, crowded street in a commercial area of Queens.

*See* ECF No. 10-4 at 13, 23 (testimony that people were "out and about" in the

"commercial" area where Petitioner was arrested).  Detective Piccininni had been

informed by Scott that Petitioner carried a knife during the March 5, 2016 encounter,

*see id.* at 9, and thus he had reason to believe that Petitioner might have been armed

on the day in question as well.  Petitioner was also not handcuffed at the time of the

relevant question, *see id.* at 16, meaning he may have been able to access any weapon

28

he did carry.   Moreover, Detective Piccininni's question was limited in scope, directed solely at identifying whether Petitioner was carrying any weapons. Considering the totality of the circumstances, his question was justified by a reasonable concern for the officers' and the public's safety.  *See United States v. Newton*, 369 F.3d 659, 677–79 (2d Cir. 2004) (finding that the public safety exception applied in part because officers had been told by defendant's mother that he had a firearm and that he had threatened to kill her and her husband, despite the fact that defendant was handcuffed at time of relevant question); *Reyes*, 353 F.3d at 153–55 (finding that the public safety exception applied in part because defendant was arrested in a public place "in front of a bodega and across the street from a school," the officers "had specific information that he routinely carried a firearm while conducting business" as a narcotics dealer, and the questions were "limited in scope and were not posed to elicit incriminating evidence").

### ii.  Insufficient Evidence Claim

Petitioner also argues that he is entitled to habeas relief because "the evidence introduced at trial was not legally sufficient to support conviction."  *See* ECF No. 1 at 8.  Specifically, he asserts that Scott's testimony was "fabricated, along with other fabricated incident which deprive [*sic*] [Petitioner] of his innocence."  *Id.*  He also asserts that the prosecution failed to present medical records from Scott's retinal surgery.  *See id.*  Liberally construed, he appears to challenge the legal sufficiency

of the evidence supporting the jury's finding of guilt on the counts for which the prosecution had to prove, among other elements, that he caused a "physical injury."

A habeas petitioner seeking relief on grounds of insufficient evidence "bears a heavy burden because the government receives the benefit of having all permissible inferences drawn in its favor." *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (internal quotation marks and citations omitted).  To succeed on a legal insufficiency claim, a petitioner must demonstrate that, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Petitioner's contention that Scott's testimony was "fabricated" does not provide a basis for habeas relief.  A court reviewing an insufficiency of the evidence claim must defer to the jury's "assessments of the weight of the evidence and the credibility of witnesses." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996).  The court may neither "disturb the jury's findings with respect to witnesses' credibility," *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989), nor "make credibility judgments about the testimony presented at petitioner's trial or . . . weigh conflicting testimony," *Fagon v. Bara*, 717 F. Supp. 976, 979 (E.D.N.Y. 1989).  Here, much of the prosecution's case rested on the credibility of Scott's testimony, which Petitioner's counsel challenged on cross-examination and during summation.  In finding Petitioner guilty, the jury resolved any issues of Scott's credibility in the

prosecution's favor. *See Huber v. Shriver*, 140 F. Supp. 2d 265, 277 (E.D.N.Y. 2011). Scott's testimony, which is discussed above, along with the rest of the evidence presented at trial, was sufficient to allow a reasonable jury to find that Petitioner was guilty beyond a reasonable doubt of the charged crimes.

Petitioner's argument that the evidence was legally insufficient to prove that Scott suffered a "physical injury" because the prosecution did not enter into evidence Scott's medical records from her retinal surgery is also meritless. The charges of third-degree assault, first-degree burglary, and aggravated criminal contempt do include a "physical injury" element. *See* N.Y. Penal Law §§ 120.00(1), 140.30(2), 215.52(1). "Physical injury," in turn, is defined under state law as "impairment of physical condition or substantial pain." *Id.* § 10.00(9). "Substantial pain" has been held to mean pain that is "more than slight or trivial," *People v. Chiddick*, 8 N.Y.3d 445, 447 (2007), but physical impairment or substantial pain need not reach a "particular degree" or threshold, *People v. McDowell*, 28 N.Y.2d 373, 375 (1971). To determine whether sufficient pain was shown to support a finding of "substantial pain," courts may consider "the injury defendant inflicted, viewed objectively," "the victim's subjective description of what [she] felt," whether the victim "sought medical treatment for the wound defendant inflicted," and "the motive of the offender." *Chiddick*, 8 N.Y.3d at 447–48; *see also Carey v. Passage*, No. 21-CV-7497, 2023 WL 11906338, at *11 (S.D.N.Y. Nov. 21, 2023) (considering

*Chiddick* factors), *report and recommendation adopted*, 2024 WL 4266385 (S.D.N.Y. Sept. 23, 2024).

Petitioner is correct that the prosecution did not enter into evidence medical records from Scott's retinal surgery in November 2016. As a result, the trial judge expressly instructed the jury that it could not consider Scott's testimony regarding her torn retina in determining whether she sustained physical injury from the March 5, 2016 incident, *see* ECF No. 10-5 at 21, and the jury is presumed to have followed the judge's instructions, *see Zafiro v. United States*, 506 U.S. 534, 540 (1993). Nevertheless, there was ample evidence presented at trial to allow the jury to conclude that Scott sustained a "physical injury" during her encounter with Petitioner on March 5, 2016. Scott testified that Petitioner punched and kicked her in her head and stomach, causing a cut over her left eye. ECF No. 10-4 at 426–29, 439. Later that day, she received an M.R.I., a tetanus shot, and an eye examination at Queens Hospital Center. *Id.* at 445–46. When she first arrived at the hospital, her pain was a "ten" on a scale of one to ten, and the pain lasted until November of that year. *Id.* at 446. Moreover, Scott's medical records from the day of the incident showed that Scott had a "blood spot" in her eye, and a photograph of the cut above her eye was also entered into evidence. ECF No. 10-3 at 119; ECF No. 10-4 at 439–40. This evidence, viewed in the light most favorable to the prosecution, was sufficient to permit a rational jury to have found, beyond a reasonable doubt, that Scott suffered a physical injury. *See Chiddick*, 8 N.Y.3d at 446–48 (finding evidence

sufficient to establish "physical injury" where defendant bit victim's fingernail, causing it to break and bleed, and where victim "sought medical treatment for the wound defendant inflicted"); *Smith v. Duncan*, No. 03-CV-0910, 2004 WL 859201, at *7 (S.D.N.Y. Apr. 21, 2004) ("Evidence that [petitioner] punched [victim] hard enough to knock him to the floor, to cause a bump and bruising, and to result in a week of pain each time the victim tried to chew [was] sufficient to establish the element of physical injury under [state law]."), *report and recommendation adopted*, 2004 WL 1857570 (S.D.N.Y. Aug. 18, 2004).

### iii.  Pre-Indictment Delay Claim

Petitioner also argues that the delay of ten to eleven months between his arrest and indictment violated the Fifth Amendment.  *See* ECF No. 1 at 5.[9]  As Respondent notes, however, Petitioner was in fact indicted seven months after he was arrested. ECF No. 10-1 at 25.

The Due Process Clause of the Fifth Amendment provides some protection against "oppressive delay" in indicting a defendant.  *United States v. Lovasco*, 431

---

[9] To the extent that Petitioner intended to argue that the delayed indictment violated state law requirements, such as the requirement that a defendant be released from custody when no preliminary hearing is held and no indictment has been returned within 120 hours of arraignment, *see* C.P.L. § 180.80, this claim is not cognizable on habeas review, *see Dennis v. Corcoran*, No. 07-CV-6229, 2010 WL 5072124, at *9 (W.D.N.Y. Dec. 7, 2010); *see also Velazquez v. Poole*, 614 F. Supp. 2d 284, 331 (E.D.N.Y. 2007) (noting that claims based on state procedural law are "not cognizable on federal habeas review").

U.S. 783, 789 (1977).  A delay in indictment may violate the Due Process Clause where the delay "has been shown to cause 'substantial prejudice' to the defendant's ability to present his defense and 'the delay was an intentional device to gain [a] tactical advantage over the accused.'"  *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999) (alteration in original) (quoting *United States v. Marion*, 404 U.S. 307, 324 (1971)).  Moreover, an indictment brought within the statute of limitations is "presumpt[ively] valid[]" and "only rarely dismissed."  *Id.* at 751–52.

In the present case, Petitioner was arrested on May 18, 2016 for conduct that occurred between March and May 2016, *see* ECF No. 10-4 at 463, and he was indicted on December 15, 2016, *see* ECF No. 10-3 at 144.  This amounts to a delay of approximately seven months between arrest and indictment and a delay of, at most, ten months between the offense conduct and indictment.  Petitioner has not asserted that he suffered any prejudice from this pre-indictment delay, nor has he shown that the delay was "an intentional device" by the prosecution to "gain [a] tactical advantage" over Petitioner.  *See Symonds v. Griffin*, No. 15-CV-9423, 2024 WL 4044456, at *12–14 (S.D.N.Y. Sept. 4, 2024) (concluding that twelve-year delay between offense conduct and indictment did not provide basis for habeas relief).  Indeed, Respondent laid out the legal standard and what Petitioner would need to establish in order to succeed on this claim in its opposition brief, *see* ECF No. 10-1 at 25–26, and in reply, Petitioner did not set forth any concrete allegations of prejudice or government malfeasance.  Moreover, Petitioner was indicted within the

statute of limitations for the charges brought against him based on his conduct between March and May 2016.  *See* C.P.L. § 30.10 (providing that the prosecution of a felony, with exceptions not relevant here, "must be commenced within five years after the commission thereof" and that the prosecution of a misdemeanor, with exceptions not relevant here, "must be commenced within two years after the commission thereof").  Accordingly, the pre-indictment delay in this case fails to raise due process concerns.

### iv.  Ineffective Assistance of Counsel Claim

Finally, Petitioner claims that his trial counsel was constitutionally ineffective for: (1) questioning Scott about her VAWA application, thereby allowing in testimony of uncharged domestic violence incidents between Petitioner and Scott, despite knowing that Scott had submitted her visa application months before the events at issue in the instant case;[10] (2) refusing to allow Petitioner to testify at trial;

---

[10] In his *pro se* petition, Petitioner wrote that "[c]ounsel for defense presented false plead [*sic*] which incriminate the defendant," and indicated that this claim was based on the Fifth Amendment.  ECF No. 1 at 5.  Respondent interpreted this claim as asserting that trial counsel was ineffective for "presenting a 'false' defense that 'incriminate[d] him'" by allowing "the admission of prejudicial testimony" based on "the argument in [P]etitioner's direct appeal reply brief and Court of Appeals leave application."  *See* ECF No. 10-1 at 30 n.6.  I agree with this interpretation and construe Petitioner's claim to assert that trial counsel was ineffective for questioning Scott about her immigration status and VAWA application, thereby allowing in testimony about prior incidents between Scott and Petitioner, despite knowing that Scott had submitted her VAWA application several months prior to the events underlying this case.

and (3) refusing to present an alibi defense and call an alibi witness who was available at trial. *See* ECF No. 1 at 5–6.

To establish ineffective assistance of counsel, a petitioner must show that his counsel's performance was "deficient" and that the deficient performance "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy *Strickland*'s first prong, a petitioner "must show that counsel's representation 'fell below an objective standard of reasonableness' determined according to 'prevailing professional norms.'" *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007) (quoting *Strickland*, 466 U.S. at 688). This evaluation is made "from counsel's perspective at the time of and under the circumstances of trial." *Id.* (citing *Strickland*, 466 U.S. at 689). Courts reviewing ineffective assistance of counsel claims "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. To establish *Strickland*'s second prong, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability means a 'substantial,' not just 'conceivable,' likelihood of a different result." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)). The petitioner bears the burden of establishing both prongs. *Murden*, 497 F.3d at 198. As discussed above, the Second Circuit has held that ineffective assistance of counsel arguments should be considered cumulatively. *Rodriguez*, 928 F.2d at 538.

Petitioner first argues that his trial counsel was ineffective for cross-examining Scott about her immigration status and VAWA application, thereby allowing in testimony about prior uncharged incidents between Petitioner and Scott, despite knowing that Scott had filed her VAWA application several months before the events underlying the instant case. In essence, this claim attacks counsel's strategy of attempting to show that Scott had reason to fabricate the March 5, 2016 incidents at trial. The Court in *Strickland* recognized that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689. As a result, trial counsel's tactical decisions regarding defense strategy "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690; *see also United States v. DiTommaso,* 817 F.2d 201, 215 (2d Cir. 1987) ("We will not second-guess trial counsel's defense strategy simply because the chosen strategy has failed."). "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." *Mason v. Scully,* 16 F.3d 38, 42 (2d Cir. 1994) (internal quotation marks and citation omitted); *accord United States v. Eisen,* 974 F.2d 246, 265 (2d Cir. 1992) ("[D]ecisions that fall squarely within the ambit of trial strategy, . . . if reasonably made, cannot support an ineffective assistance claim." (internal quotation marks and citation omitted)). In particular, "the conduct of examination and

cross-examination is entrusted to the judgment of the lawyer . . . ." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998).

In the instant case, Petitioner has not met his burden of establishing that defense counsel's performance was deficient.  The record shows that defense counsel cross-examined Scott about her immigration status and her VAWA application in an attempt to undermine her credibility as part of counsel's defense strategy.  *See* ECF No. 10-4 at 72.  Defense counsel prepared for trial with this strategy in mind, requesting additional information from the prosecution and raising the issue during pre-trial hearings, and she was aware that pursuing this strategy would allow in testimony about other uncharged incidents between Petitioner and Scott.  *See id.* at 44–48, 52–57, 77.  Defense counsel made a reasonable decision to pursue this strategy despite this risk because Scott's damaging testimony against Petitioner was central to the prosecution's case and thus undermining Scott's credibility was crucial to the defense.  The fact that counsel knew that Scott had filed her VAWA application prior to the incidents underlying the instant case does not change this analysis.  Counsel attempted to show that Scott, whose VAWA application was still pending at the time of trial, had fabricated an "ongoing pattern [of] . . . alleged abuses" against Petitioner that served as the basis of both her pending VAWA application and the instant case.  *See id.* at 77.  Although defense counsel's strategy did not ultimately prevail, the choice to cross-examine Scott about her

38

VAWA application in an attempt to undermine her credibility did not fall outside the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Petitioner next argues that defense counsel refused to allow him to testify at trial. A criminal defendant has a constitutional right to testify on his own behalf. *Rock v. Arkansas*, 483 U.S. 44, 49–53 (1987). The decision whether to testify belongs to the defendant alone and may not be made for him by defense counsel. *Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997). Accordingly, "[a]lthough counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying . . . counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter." *Id.* at 79. A petitioner's claim that "he was denied the right to testify is considered a 'component' of his ineffective assistance of counsel claim, and is therefore reviewed under the two-part *Strickland* standard." *Guidice v. United States*, No. 03-CV-4983, 2007 WL 1987746, at *14 (E.D.N.Y. July 3, 2007) (citing *Brown*, 124 F.3d at 79). "[C]ourts may presume, unless the defendant can overcome the presumption, that defense counsel was effective and did not fail to advise the defendant of his right to testify." *Id.* (citing *Strickland*, 466 U.S. at 689). "A petitioner can satisfy the first *Strickland* prong by demonstrating that trial counsel failed to inform him either of his right to testify or of his right to make the ultimate decision whether to testify." *Hayward v. Brown*, No. 09-CV-6495, 2010 WL 2629037, at *23 (S.D.N.Y. July 1, 2010). However, "[a]

petitioner's unsupported assertions that defense counsel failed to inform him of his right to testify are insufficient to meet *Strickland*'s requirements." *Id.* at *22.

In the instant case, Petitioner asserts that "[c]ounsel for defense refuse[d] to mention . . . that the defendant wanted to testify on defense behalf" and that "the defendant . . . was present at trial [and] requested to testify, in which counsel for the defense refuse[d] to do." ECF No. 1 at 5–6. Petitioner fails to overcome the presumption that counsel informed him of his right to testify. In support of his claim, Petitioner offers only his own "ambiguous, self-serving, and unsupported statement" that trial counsel refused his desire to testify. *See Halo v. United States*, No. 06-CV-5041, 2007 WL 1299158, at *9 (E.D.N.Y. Apr. 30, 2007). Indeed, Petitioner does not provide any information about the content of his proposed testimony or about the conversations that he had with trial counsel about his desire to testify. Respondent, in its opposition brief, noted the absence of support for Petitioner's claim, *see* ECF No. 10-1 at 48–50, but Petitioner nevertheless failed to provide any information in his reply about the circumstances surrounding counsel's alleged refusal to allow him to testify. Courts have denied similar claims when supported only by a petitioner's self-serving arguments. *See, e.g.*, *Carter v. Fields*, No. 19-CV-5364, 2020 WL 5819899, at *12 (E.D.N.Y. Sept. 29, 2020); *Halo*, 2007 WL 1299158, at *9. Tellingly, Petitioner raises this argument for the first time in

his habeas petition and presents no explanation for not raising the argument sooner.[11] In the absence of any evidence that counsel refused to allow Petitioner to testify, this claim must be denied. *Burt v. Titlow*, 571 U.S. 12, 22–23 (2013) ("[T]he absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" (alteration in original) (quoting *Strickland*, 466 U.S. at 689)).

Finally, Petitioner argues that his counsel was ineffective for refusing to present an alibi defense and for failing to call a witness at trial who would have provided an alibi for Petitioner. Courts in this Circuit have made clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir. 1987). "Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed." *United States v. DeJesus*, 57 F. App'x 474, 478 (2d Cir. 2003); *accord Harris v. Hollins*, No. 95-CV-4376, 1997 WL

---

[11] The trial transcript suggests that Petitioner was likely aware of his right to testify at the time of trial. Prior to jury selection, in Petitioner's presence, defense counsel, the prosecutor, and the trial judge discussed whether any prior bad acts would be admissible at trial. *See* ECF No. 10-4 at 67–72. The parties made multiple references throughout this discussion to Petitioner's decision to testify, such as "if the defendant does cho[o]se to testify in this case . . . ." *Id.* at 69–70. Nevertheless, Petitioner failed to raise counsel's alleged refusal to allow him to testify until the instant petition.

633440, at *6 (S.D.N.Y. Oct. 14, 1997) (concluding that counsel was not ineffective for failing to call an alibi witnesses where counsel presented a vigorous defense). Moreover, a petitioner may not merely allege that certain witnesses might have supplied relevant testimony; rather, they must state exactly what testimony the witness would have supplied and how such testimony would have changed the result of trial. *See, e.g.*, *Greenidge v. United States*, No. 01-CV-4143, 2002 WL 720677, at *2 (E.D.N.Y. Mar. 27, 2002) (finding petitioner's ineffective assistance of counsel claim had no merit where petitioner "fail[ed] to identify the witnesses counsel purportedly failed to call" and "nowhere specifie[d] how the testimony of those witnesses would have been helpful to his defense").

In the instant case, Petitioner did not provide any information about his alibi witness, including the witness's identity or proposed testimony. Petitioner also does not discuss when he allegedly shared the existence of an alibi witness with his counsel or about the nature of his discussions with counsel about the witness. As with prior claims, Respondent addressed in its opposition brief what Petitioner would need to show to succeed on this claim, *see* ECF No. 10-1 at 51–52, but Petitioner did not address these issues at all in his reply. Moreover, Petitioner has failed to show that counsel's decision not to call the alibi witness was not a choice of trial strategy. Indeed, counsel reasonably could have been concerned that the jury would not have believed the alibi witness over Scott's detailed testimony, potentially harming rather than benefitting Petitioner's case. *See Lawson v. Caspari*, 963 F.2d

42

1094, 1095–96 (8th Cir. 1992) (concluding that counsel was not ineffective for failing to call alibi witnesses he did not believe were credible, particularly where counsel extensively cross-examined the state's witnesses and presented a theory of self-defense).

Finally, even considering Petitioner's claims collectively, Petitioner has not established that his counsel provided ineffective assistance. Defense counsel had a clear strategy focused on undermining Scott's credibility that she executed at trial. On cross-examination, defense counsel elicited evidence to support the defense theory, including information about Scott illegally overstaying her visa and about Scott contacting an immigration attorney soon after her relationship with Petitioner deteriorated. *See* ECF No. 10-4 at 489–90, 493–94. Defense counsel also revisited this theme on summation, arguing that the prosecution's case rested almost entirely on Scott's testimony but that Scott had a motive to lie to gain sole custody of her daughter and to obtain legal permanent resident status. *Id.* at 614–16, 623–25, 627. The fact that this strategy did not ultimately prevail does not mean that counsel provided ineffective assistance.

Considering the second prong of *Strickland*, even if counsel had not cross-examined Scott about her VAWA application and had called Petitioner and an alibi witness to testify, Petitioner has not established that there was a "reasonable probability that the verdict would have been different." *Brown*, 124 F.3d at 84. The prosecution introduced a significant amount of evidence against Petitioner at trial,

43

including Scott's clear testimony about the events in March and May 2016; a recording of Scott's second 911 call from March 5, 2016; Scott's medical records from March 5, 2016; photographs of the cut above Scott's left eye, the damaged door to Scott's bedroom, and the broken window in the basement of the Cambria Heights house; and the testimony of the police officers and Scott's housemate. The jury was also aware that Scott had obtained a prior order of protection against Petitioner. Had Petitioner and an alibi witness directly contradicted Scott's testimony, the jury would have had to make credibility determinations about the witnesses, and Petitioner has failed to show that the jury would have been more likely to believe his testimony and the testimony of an unknown alibi witness over Scott's. *See Hayward*, 2010 WL 2629037, at *24 (concluding that petitioner had not shown that he was prejudiced by failure to testify on his own behalf because proposed testimony directly contradicted other witness testimony and, in order for the result of the proceeding to be different, "the jury would have had to credit [petitioner's] self-serving testimony over the testimony" of the other witnesses). Indeed, defense counsel attempted to undermine Scott's credibility on multiple occasions at trial, and the jury still ultimately convicted Petitioner. Moreover, if Petitioner did testify at trial, the prosecution would have been permitted to question him about a prior assault charge related to a domestic violence incident and about his awareness of the order of protection, which may have harmed Petitioner's reputation in the eyes of the jury. *See* ECF No. 10-4 at 212–14. Considering this substantial evidence mounted against

him at trial, Petitioner has failed to show that there is a reasonable possibility that the outcome of trial would have been different even if he and an alibi witness had testified and even if Scott had not testified about the uncharged incidents underlying her VAWA application. Because Petitioner failed to meet his burden under either *Strickland* prong, he is not entitled to habeas relief on ineffective assistance of counsel grounds.[12]

## III.   Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

Brooklyn, New York                                    *Edward R. Korman*
March 20, 2025                                         Edward R. Korman
                                                      United States District Judge

---

[12] Having concluded that Petitioner has not met his burden under the second *Strickland* prong, it is not necessary to obtain an affidavit from Petitioner's prior counsel regarding the ineffective assistance of counsel claims. *See Carter*, 2020 WL 5819899, at *12 ("While the [c]ourt ordinarily would be reluctant to dismiss [p]etitioner's claim . . . without a sworn statement from [p]etitioner's counsel contesting [p]etitioner's version of events, the [c]ourt finds it unnecessary to do so here because [p]etitioner fails to demonstrate that there is a reasonable probability that his proffered testimony would have resulted in his acquittal, and thus he fails to meet his burden under the second prong of *Strickland*." (cleaned up)).